```
            UNITED STATES DISTRICT COURT FOR THE
                  DISTRICT OF NEW HAMPSHIRE
```

Donna L. Puig

   v.                                        Civil No. 08-cv-253-JD
                                              Opinion No. 2009 DNH 056

Michael J. Astrue, Commissioner,
Social Security Administration

O R D E R

Donna L. Puig seeks review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's decision denying her application for Social Security Disability Benefits. Puig contends that the Administrative Law Judge ("ALJ") erred in concluding that she was not disabled. The Commissioner moves to affirm the decision.

Background

Donna Puig is a high school graduate with a year of college and earned a certificate as a dental assistant. She is married, with two children. She worked full-time as a dental assistant from 1982 until her children, who are twins, were born in 1997. She then worked part-time for a year from mid-2002 to July of 2003, when she stopped working primarily due to memory problems, but also because of numbness in her hands, back and leg pain, headaches, and blurred vision. Her social security disability

insured status expired on December 31, 2004, when she was forty years old.

In October of 2002, Dr. Schiavoni of Southern New Hampshire Internal Medicine examined Puig due to her complaints of stomach pain.  Dr. Schiavoni noted that Puig was tearful and was experiencing financial stress and concern about the illness of her father and her son.  Puig was taking Effexor for depression, and occasionally Xanax, and she was seeing a counselor.  At her appointment three weeks later, Puig was less anxious and depressed and her physical symptoms had decreased.  Puig continued treatment with Dr. Schiavoni and also saw Dr. Schneebaum for myofascial pain into 2004 without significant changes.

Puig was diagnosed with carpal tunnel syndrome in May of 2004.  Dr. Rowland, at Concord Orthopaedics Professional Association, recommended carpal tunnel release surgery to be done first on her right wrist and later on her left wrist.  The surgery was performed on her right wrist on July 12, 2004.  In August, Dr. Schiavoni reported that the surgery had been successful.  Otherwise, Puig continued to have myofascial pain and low-grade depression, for which she took medication without side effects.  Medical records through the period note that Puig was obese.  Puig had carpal tunnel release surgery on her left

wrist in November of 2004.  Dr. Rowland and Dr. Schneebaum reported that Puig was doing extremely well.

In November of 2004, Dr. Schiavoni wrote that Puig continued to have low-grade depression with less prominent anxiety.  She continued with counseling and found it helpful.  Puig's myofascial pain symptoms were unchanged.  Dr. Rowland also reported that Puig was doing remarkably well with a full range of motion in her fingers following surgery on the left wrist.

In February of 2005, Puig reported some aching soreness in the area near the surgical scar.  She also reported worsening gastroesophageal reflux disease symptoms, musculoskeletal pain, and headaches.  A medical note in March of 2005 indicated no significant change in Puig's symptoms.

In October of 2006, Puig's counselor wrote that she had met with Puig twenty-seven times between April of 2002 and December 31, 2005.  Another counselor had met with Puig fifteen times between August of 2004 and February of 2005.  The counselor noted Puig's reports of constant physical pain and of struggling with her daily tasks.  The counselors diagnosed moderately severe, recurrent major depression with panic disorder.

Dr. Nault, a state agency physician, reviewed Puig's medical records and prepared an assessment of her residual functional capacity through her last insured date of December 31, 2004.  He

found that Puig was limited to carrying ten pounds frequently and twenty pounds occasionally.  He found that she could sit, stand, or walk for six hours in an eight hour day and that she could occasionally climb, balance, stoop, kneel, crouch, and crawl.  He restricted her ability to manipulate, handling and fingering, to no more than occasionally.

On October 3, 2007, Dr. Rescigno, a neurologist who began treating Puig in April of 2007, prepared an assessment of Puig's ability to perform physical work-related activity.  His assessment was based on limitations that he found began in February of 2007, except those related to her carpal tunnel syndrome which began in April of 2004.  Dr. Rescigno found that Puig could occasionally lift and carry ten pounds but could only rarely lift and carry between eleven and twenty pounds.  He also found that she could sit for four hours out of an eight hour day but only for fifteen to twenty minutes at a time; she could stand for three hours and could walk for one hour, but only for five minutes at a time, out of an eight hour day.  Dr. Rescigno stated that Puig could use her hands only occasionally and could never climb, balance, stoop, crouch, or crawl.  Dr. Rescigno's findings were based on his studies that indicated Puig had pseudomotor cerebri (a condition of intracranial pressure causing headache

and nausea), lumbrosacral spondylosis, and carpal tunnel syndrome.

Puig applied for social security disability benefits in August of 2006, alleging disability beginning on July 1, 2003, which continued through the date when she was last insured on December 31, 2004.  Her claim was denied initially and subsequently by a Federal Reviewing Official.[1]  She requested an administrative hearing, which was held on December 19, 2007.

At the hearing, Puig was represented by counsel and testified.  Puig described the memory problems and pain that caused her to stop working in July of 2003.  She explained the problems she experienced due to carpal tunnel syndrome and the surgery she had had in July of 2004.  She testified that despite the surgery, she was unable to hold things for a long time and still had numbness at the surgical sites, that she had constant numbness and tingling in her hands, and that at the time of the hearing there was very little improvement in her hands compared to their condition before surgery.

---

[1]The Social Security Administration is using a new procedure under which a claimant whose application is denied initially may request review by a Federal Reviewing Official, and if that result is unsatisfactory, the claimant may request a hearing before an ALJ.  See Pacheco v. Astrue, 2009 WL 453370, at *1, n.1 (D.N.H. Feb. 24, 2009).

Puig testified that she had received counseling for depression and suicidal tendencies since just after she stopped working. She said that in 2004, she did not want to get out of bed because of depression but she did get up to bring her children to school and would then stay in bed until she had to get up to bring them home. She testified that her husband did all the household chores and most of the shopping.

Puig also testified that she had an extensive history of myofascial pain, which had gotten worse over time. She said that she could not at the time of the hearing or in 2004 lift twenty pounds or frequently lift or carry ten pounds. She said that she could only stand for five or ten minutes, that she could sit for about ten minutes but would have to constantly change position, and that at the hearing after sitting for twenty-five minutes she was ready to get up and walk around.

In response to a question about a suggested job, Puig testified that she could not have done that work in 2004 because she could not sit or stand long enough. She also said that she was not stable enough to deal with people and that her irritable bowel syndrome would have interfered with her work. Puig testified that she had increased vision and memory problems that she attributed to pseudotumor celebri, diagnosed by Dr. Rescigno.

The ALJ issued his decision on January 23, 2008, denying Puig's claim.  The ALJ concluded that Puig had severe impairments due to carpal tunnel syndrome, myofascial pain syndrome, and obesity.  He found that through December 31, 2004, when her insured status expired, Puig had the residual functional capacity to do a range of light work except that she could only occasionally climb, balance, stoop, kneel, crouch, and crawl, and that she had a limited ability to perform manipulation activities.  The ALJ concluded that the restrictions on Puig's ability to do a full range of light work had little or no effect on the occupational base for unskilled light work.  Although he found that Puig could not return to her former work as a dental assistant, he found that other work existed that she could do, as provided under 20 C.F.R., Appendix 2, Medical-Vocational Rule 202.21.  The ALJ also noted that his finding was consistent with the opinion of the vocational expert who responded to a hypothetical question posed by the federal review official that the same residual functional capacity would allow work in jobs such as a sales attendant, counter attendant, school bus monitor, order clerk, and surveillance systems monitor.

The ALJ concluded that Puig was not disabled before December 31, 2004.  The Decision Review Board denied Puig's request for

review.  Therefore, the ALJ's decision is the decision of the Commissioner for purposes of judicial review.

## Discussion

In support of her motion to reverse the Commissioner's decision, Puig contends that the ALJ erred in his residual functional capacity finding, failed to give adequate weight to Puig's non-exertional limitations, failed to give adequate weight to her treating source's opinions, and erred in failing to have a vocational expert testify at the hearing.  The Commissioner defends the decision, contending no error occurred.

A five-step process is used to evaluate an application for social security benefits.  20 C.F.R. § 404.1520(a).  The applicant bears the burden through the first four steps to show that he is disabled.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the Commissioner bears the burden of showing that jobs exist in the national economy that the applicant can perform.  Id.

The court's review under § 405(g) is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  If the ALJ's factual findings are supported by substantial evidence in the record,

they are conclusive, even if other evidence would support a contrary conclusion.  Id.; Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).

A.   Residual Functional Capacity Assessment

Puig argues that based on her testimony at the hearing, which she contends is corroborated by medical evidence, she had memory problems, pain, and major depression that prevented her from working.  She contends that the ALJ failed to consider these impairments.  The Commissioner points to evidence in the record that supports the ALJ's assessment.

If the residual functional capacity finding is supported by substantial evidence in the record, it is conclusive.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  Findings are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Id.  In general, an ALJ, as a lay person, cannot interpret a claimant's medical records to determine his residual functional capacity.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996).  Instead, an ALJ must rely on residual functional

capacity evaluations done by a physician or another expert.  <u>Id.</u> at 17-18.

In this case, the medical evidence in the record does not support Puig's view of her limitations.  The ALJ found that her description of her limitations was not entirely credible. Although she was treated for a variety of physical symptoms and for depression during the time of her insured status, the medical records show that she responded well to treatment.[2]  Dr. Nault's residual functional capacity assessment done for the period of her insured status found that she was capable of light work with some postural and manipulation limitations, which the ALJ incorporated into his assessment.

Puig also argues that the ALJ failed to give proper weight to the opinions of her treating source, Dr. Rescigno, in assessing her residual functional capacity.  The ALJ explained that he gave Dr. Rescigno's opinions about Puig's residual functional capacity and her limitations no weight because his assessment was made in October of 2007, and pertained to her treatment during 2007, which was years after the end of her

---

[2]Puig's counselor's note, dated October 23, 2006, indicates major depression of moderate severity that "did not seem to lift" despite medication.  In contrast to that note, however, Puig's other treating sources during the period reported that she was responding well to medication for depression.

insured status.[3]  In his report, Dr. Rescigno stated that the limitations he found due to pseudotumor were first present in February of 2007, although her carpal tunnel syndrome was present in April of 2004.  The remainder of the limitations Dr. Rescigno found began in 2007.

Therefore, substantial evidence in the record supports the ALJ's residual functional capacity finding.

B.  Non-Exertional Limitations and the Grid

Puig contends that the ALJ failed to properly consider the effects of her non-exertional limitations on the occupational base for unskilled light work.  In particular, Puig contends that the ALJ failed to consider the combined effect of her myofascial pain syndrome, anxiety and depression, irritable bowel syndrome, gastroesophageal reflux disease, carpal tunnel syndrome, and obesity.  She argues that the ALJ, therefore, erred in relying on the Grid to determine that she was not disabled.

The Grid allows the Commissioner to satisfy his burden at step five without opinion testimony of a vocational expert.

---

[3]Although Puig asserts that Dr. Rescigno was her treating physician since 2004, the record she cites shows that Dr. Rescigno only performed an EMG in April of 2004 while she was being treated by Dr. Rowland.  Other records show that Puig began treating with Dr. Rescigno in 2007.

Ortiz v. Sec'y of HHS, 890 F.2d 520, 524 (1st Cir. 1989). "[T]he more that occupational base is reduced by nonexertional impairment [however], the less applicable are the factual predicates underlying the Grid rules, and the greater is the need for vocational evidence." Id. at 524-25. Under the social security regulations, an ALJ is required to consider "the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523; Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).

The ALJ concluded that Puig's depression and anxiety were controlled with medication and caused only mild difficulties in maintaining social functioning, concentration, persistence, and pace. As a result, the ALJ found that Puig's mental disorders did not cause a severe impairment. After reaching that conclusion, the ALJ did not consider the mental disorders in his evaluation. The ALJ expressly considered Puig's non-exertional physical and pain limitations in combination and concluded that they impaired her ability to do a full range of light work because she could only occasionally climb, balance, stoop, kneel, crouch, and crawl.

Other courts have held that mild or moderate depression does not significantly limit the claimant's ability to perform a full

range of work at the designated exertional level.  See Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007); see also Smalls v. Comm'r of Social Sec., 2009 WL 691931, at *10 (D.S.C. Mar. 12, 2009); Adkins v. Astrue, 2009 WL 702804, at *5 (N.D. Fl. March 17, 2009); Walton v. Astrue, 2009 WL 605235, at *6 (C.D. Cal. Mar. 5, 2009); Gilliam v. Astrue, 2008 WL 747438, at *5 (E.D. Tenn. Mar. 19, 2008).  If the combination of Puig's other non-exertional impairments found by the ALJ, would significantly erode the occupational base, the ALJ could not rely exclusively on the Grid.  See, e.g., Nguyen, 172 F.3d at 36; Heggarty v. Sullivan, 947 F.2d 990, 995-96 (1st Cir. 1991); Ortiz, 890 F.2d at 524.  In this case, however, the ALJ also relied on the opinion of a vocational expert who responded to a hypothetical question posed by the Federal Reviewing Official, with the same limitations found by the ALJ, and provided evidence of jobs Puig could do despite her limitations.

C.  Vocational Expert Opinion

Puig faults the ALJ's use of the vocational expert's opinion, arguing that because it was not presented during the administrative hearing, its use violates due process, and arguing that the hypothetical posed to the vocational expert did not include all of Puig's non-exertional impairments.  The

Commissioner contends that the ALJ properly considered the vocational expert's opinion and that it was based on Puig's limitations.

As part of the review process, the Federal Reviewing Official sought an opinion from a vocational expert.  He posed a hypothetical to a vocational expert of a younger person with a high school education, with past relevant work as a dental assistant, who could lift twenty pounds occasionally and ten pounds frequently, who could stand, walk, or sit for six hours in an eight hour day, and who could only occasionally climb, balance, stoop, kneel, crouch, or crawl.  In addition, the hypothetical was limited to only occasional manipulation.  The vocational expert responded that such a person could not return to work as a dental assistant but could do light and sedentary unskilled jobs as a sales attendant, counter attendant, school bus monitor, order clerk, and surveillance system monitor.

The hypothetical and the vocational expert's response were included in the administrative record as Exhibit 9E.  At the beginning of the administrative hearing, the ALJ stated that he had documents marked as Exhibits 1 through 13F.  The ALJ asked Puig's counsel if she had any objections to the introduction of any of the documents, and counsel responded that she did not have any objections.  The ALJ noted that there were no objections and

admitted all of the documents into the record. Therefore, the vocational expert's opinion was admitted into the record without objection from Puig's counsel.

In addition, during the hearing, Puig's counsel addressed the vocational expert's opinion and the work that he suggested. Counsel stated that the opinion was at Exhibit 9E. She asked Puig if she could have performed the work of a school bus monitor in 2004, and Puig responded that she could not because she could neither stand nor sit for "a length of time," and that there was "a big issue also with [whether] my mental health was stable enough to deal with people of any kind." Tr. 48. Puig also stated that her irritable bowel syndrome would have precluded work as a school bus monitor. Counsel did not address the other work identified by the vocational expert. Therefore, Puig cannot now object to use of the vocational expert's opinion.

The Federal Reviewing Official's hypothetical included the same limitations found by the ALJ. Although Puig contends that she was impaired by additional limitations, substantial evidence supports the ALJ residual functional capacity assessment. Therefore, the ALJ properly relied on the vocational expert's opinion, which provides substantial evidence to carry the Commissioner's burden, at step five, that work existed which Puig

could perform.  Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 429 (1st Cir. 1991).

## Conclusion

For the foregoing reasons, the plaintiff's motion to reverse (document no. 8) is denied.  The Commissioner's motion to affirm (document no. 10) is granted.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

April 21, 2009

cc:  Darlene M. Daniele, Esquire
     Gretchen Leah Witt, Esquire

16